OA 91  Criminal Complaint

# United States District Court

FILED

2008 JUN -2 P

_____ NORTHERN _____    DISTRICT OF _____ CALIFORNIA _____

UNITED STATES OF AMERICA
V.

~~SEALED BY ORDER OF THE COURT~~

Jules Minh Son VO,
Nhu Mai NGUYEN,
Tan Minh VO,
Kevin VO,
Nguyen Nhu TRAN, and Richard Khoi TRAN

(Name and Address of Defendant)

RICHARD W. WIEKING
CLERK
NO. DIST. OF CA. S.J.

**CRIMINAL COMPLAINT**

Case Number: _____

# 08-70317 PVT

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about _1/6/2006 through 5/28/2008_ in _____ Santa Clara _____ County, in
(Date)

the _____ Northern _____ District of _____ California _____ defendant(s) did,

(Track Statutory Language of Offense)

conspire to commit an offense against the United States, to wit, a violation of 18 U.S.C. 2314, in that the defendants, and each of them, did agree to transport in interstate commerce merchandise of a value of $5,000 and more, knowing the same to have been stolen, converted, and taken by fraud; and that, in furtherance of the conspiracy, a conspirator committed the following overt act: on April 26, 2006, Tan Minh Vo signed a shipping document for merchandise (including purportedly stolen merchandise purchased by Mai Nguyen from an undercover police officer on March 15, 2006) to be shipped from BAX Global, in Fremont, California, to KMD Distributors, in Oceanside, New York;

in violation of Title _____ 18 _____ United States Code, Section(s) _____ 371 and 2314 _____ .

I further state that I am a(n) _____ Task Force Agent, FBI _____ and that this complaint is based on the
(Official Title)

following facts:

SEE ATTACHED AFFIDAVIT OF JOHN BARG

PENALTIES: up to 5 years imprisonment, $250,000 fine, 3 year TSR, $100 SAF

REQUESTED BAIL: No Bail (Government Will Request Detention)

REQUESTED PROCESS: Arrest Warrant for each named defendant

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

Approved
As To
Form: _____
        AUSA

_____
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

_____ June 2, 2008 _____
Date

at _____ SAN JOSE, CALIFORNIA _____
        City and State

PATRICIA V. TRUMBULL        United States Magistrate Judge
_____
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, John L. Barg, do swear and affirm as follows:

### Introduction

1.     I make this affidavit in support of each of the following arrest and search warrants:

### Arrest Warrants

a.     Arrest warrant for Jules Minh Son VO, born August 16, 1949, who resides at 1164 Bendmill Way, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that JULES VO is guilty of interstate transportation of stolen property ("ITSP"), money laundering, and conspiracy to commit both of those offenses.

b.     Arrest warrant for Nhu Mai NGUYEN (Mai Nguyen), born May 15, 1953, who resides at 1164 Bendmill Way, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that NGUYEN is guilty of conspiracy to commit ITSP.

c.     Arrest warrant for Tan Minh VO, born December 3, 1972, who resides at 2534 Brahms Avenue, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that TAN VO is guilty of conspiracy to commit ITSP.

d.     Arrest warrant for Kevin VO, born January 7, 1983, who resides at 2534 Brahms Avenue, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that KEVIN VO is guilty of conspiracy to commit ITSP.

e.     Arrest warrant for Nguyen Nhu TRAN, born April 23, 1980, who resides at 1164 Bendmill Way, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that NGUYEN TRAN is guilty of conspiracy to commit both ITSP and money laundering.

f.     Arrest warrant for Richard Khoi TRAN, born September 12, 1982, who resides at 2534 Brahms Avenue, San Jose, California. The facts set forth in this affidavit establish that there is probable cause to believe that RICHARD KHOI TRAN is guilty of conspiracy to commit ITSP.

### Search Warrants

g.     Search warrant for the residence at 1164 Bendmill Way, San Jose, California, more

particularly described in Attachment A-1. The facts set forth in this affidavit establish that there is probable cause to believe that evidence, fruits, and/or instrumentalities of the offenses described in this affidavit, and which items are more particularly described in Attachment B, will be found at this location.

h.    Search warrant for the residence at 2534 Brahms Avenue, San Jose, California, more particularly described in Attachment A-2. The facts set forth in this affidavit establish that there is probable cause to believe that evidence, fruits, and/or instrumentalities of the offenses described in this affidavit, which items are more particularly described in Attachment B, will be found at this location.

i.    Search warrant for the business JV Tools and General/Wholesale, 1249 Old Bayshore Highway, San Jose, California, more particularly described in Attachment A-3. The facts set forth in this affidavit establish that there is probable cause to believe that evidence, fruits, and/or instrumentalities of the offenses described in the preceding sub-paragraphs, which items are more particularly described in Attachment B, will be found at this location.

j.    Search warrant for the business JV Tools and General/Wholesale, 2000 Senter Road, San Jose, California, more particularly described in Attachment A-4. The facts set forth in this affidavit establish that there is probable cause to believe that evidence, fruits, and/or instrumentalities of the offenses described in this affidavit, which items are more particularly described in Attachment B, will be found at this location.

## Agent's Background

2.    I am a police officer for the City of San Jose Police Department ("SJPD"), and have been so employed for the past eight years. For the past three years, I have been assigned as a detective in the Narcotics/Covert Investigations unit of the SJPD. I am also currently a sworn Deputy United States Marshal and member of an FBI task force targeting Organized Retail Crime. My daily occupation is the investigation if crimes involving narcotics, stolen property, identity theft, and other crimes which lend themselves to covert investigation.

3.    I attended the San Jose Police Department Academy as part of my basic training to become a police officer. I received over 40 hours of training on theft-related crimes, including the receiving and passing of stolen property. I learned about how most thefts occur, and the motivation behind most property crimes. I learned about theft rings, which steal mass quantities of merchandise and then re-sell those items to "fences." I learned that fences then distribute the property through a variety of vendors, including storefronts, flea markets, and Internet-based markets.

4.    After I graduated from the basic academy, I completed the San Jose Police Department's field training program, during which I received hands-on training from experienced officers in all aspects of police work, including crimes involving stolen property. I receive periodic refresher training on stolen property crimes, in the form of video tapes, written materials and lectures, from the SJPD.

BARG AFFIDAVIT (VO)                    -2-

I have also spoken with experienced burglary investigators and learned from them how most retail thefts occur and how the stolen property is then re-sold to the general public. I have participated in the investigation of over two-hundred stolen property cases and I have previously qualified as an expert for stolen property-related offenses in the courts of Santa Clara County. In addition, throughout calendar 2007, I worked undercover, posing as a "booster" of construction materials. In that capacity I met, befriended, and "worked" with a large number of thieves, including some ORC thieves.

5.      Beginning in December 2005, I began additional study in the field of Organized Retail Crime ("ORC"). I have spoken with experienced loss-prevention investigators who work for local retail chains (*e.g.* Safeway, Wal-Mart, Target, Raleys/Nob Hill). The investigators with whom I have spoken have advised me that their primary responsibility is the identification and apprehension of organized retail theft crews (also referred to as "booster crews"). Many of these investigators have prior law enforcement experience and all are knowledgeable in the field of ORC.

### Background Regarding Organized Retail Crime

6.      I have learned from retail store investigators that ORC is a growing problem throughout the United States, and is currently responsible for the vast majority of all thefts that are occurring on a retail level. Safeway investigator Celia Kettle estimates that between January 2005 and April 2007, ORC has cost at least $30 million in losses to her company in northern California alone. I have learned that ORC affects a wide range of retail establishments including supermarkets, chain drug stores, independent pharmacies, mass merchandisers, and convenience stores. ORC is separate and distinct from petty shoplifting in that it involves professional theft rings that move quickly from community to community and across state lines to pilfer large amounts of merchandise that is then re-packaged and sold back into the marketplace. Petty shoplifting, by contrast, is limited to items stolen for personal use or consumption.

7.      ORC theft rings typically target household commodities and consumer items that can be easily sold through fencing operations, flea markets, swap meets, and shady storefront operations. A "fence" is someone who buys and re-sells stolen property. A fence can be a former thief who has found selling and re-selling stolen property to be safer and more profitable than actually stealing the property. Fences often conceal their illegal activities, and launder their illegally-obtained profits, by establishing a business or storefront (also referred to as a "front"). Sometimes this front is engaged in some legitimate business, but often the front conducts no business whatsoever and instead is used only to conceal the illegal fencing operation. In some instances, stolen merchandise from one chain, identified by particular markings applied by that chain, has found its way to the shelves of other stores, which suggests that the ORC fences are re-selling stolen merchandise to wholesale distributors.

8.      Items that are in high demand by ORC theft rings include over-the-counter ("OTC") drug products, such as analgesics and cough and cold medications, razor blades, camera film, batteries, DVDs, beauty products, and infant formula. Those items are stolen in bulk. The fences generally pay the thieves no more than 25% of the actual retail value for the stolen items.

BARG AFFIDAVIT (VO)                          -3-

## Applicable Law

9.    The following criminal statutes, among others, are applicable to the conduct described in this affidavit:

a.    **Interstate Transportation of Stolen Property.**  18 U.S.C. § 2314 prohibits knowingly transporting, transmitting, or transferring in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud. Section 2314 is a specified unlawful activity under Title 18, United States Code, Sections 1956(c)(7)(A) and 1961(1).

b.    **Money Laundering.** 18 U.S.C. § 1956(a)(1) prohibits the following:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . .

(B) knowing that the transaction is designed in whole or in part –

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law.

c.    **Engaging in Monetary Transactions Using Criminally Derived Proceeds.**  18 U.S.C. § 1957 prohibits knowingly engaging or attempting to engage in a monetary transaction in criminally derived property of a value greater than $10,000, when such property is derived from a specified unlawful activity.

d.    **Conspiracy to Launder Money.**  18 U.S.C. § 1956(h) prohibits conspiring to commit any offense defined in either section 1956 or 1957.

e.    **Structuring Financial Transactions.** 31 U.S.C. § 5324(a)(3) prohibits structuring or assisting in structuring, or attempting to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Structuring is defined in section 5324(a) as conduct designed to evade the reporting requirements under section 5313(a) or 5325 or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order

BARG AFFIDAVIT (VO)                    -4-

issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508.

### Facts Establishing a Conspiracy to Commit ITSP

10.    I am currently investigating an ORC case involving, among other co-conspirators, the subjects listed in paragraph 1 of this affidavit. JULES MINH SON VO (JULES VO) is the leader of this group. JULES VO is an Asian male adult approximately five feet three inches tall, weighing approximately 150 pounds, with black hair, brown eyes, and a birth date of August 16, 1949. JULES VO has a California driver's license (CDL) number of A1501959. He lives at 1164 Bendmill Way in San Jose. That address is listed on JULES VO's driver's license and on the Department of Motor Vehicles registration for the vehicles registered to him. I have personally seen JULES VO enter and leave this residence at all hours of the day and night.

11.    **ORC Theft Crew Fence Leads to 1164 Bendmill Way and a Female "Fence."** On January 4, 2006, Investigator Kettle identified an organized theft crew operating in San Jose. She identified 1746 Vollmer Way, in San Jose, as a possible associated residence. I coordinated multiple surveillances at that address and ultimately arrested three suspects on February 3, 2006, for twelve counts of theft and burglary. Based on my investigation, I attributed to this crew an estimated retail loss of over $100,000. I personally observed this crew steal thousands of dollars worth of merchandise from several stores and walk out with the stolen items concealed on their persons. After the three were arrested, San Jose Police Detective Paz interviewed the suspects, each of whom admitted re-selling stolen merchandise to a fence in San Jose. One of the subjects, identified by the initials M.F., had telephone number **(408) 828-2258** saved in his cell phone. Each subject also had inventory sheets listing particular items and the amount a fence would pay for them.

12.    Before arresting the three subjects, however, I saw them meet with a woman who appeared to be their "fence." During a surveillance on January 11, 2006, I observed this crew steal not less than five thousand dollars worth of retail merchandise. I followed them to 167 N. White Road in San Jose, where they carried their stolen merchandise, contained in a large trash bag, into the residence. Approximately fifteen minutes later, an Asian woman drove up in a light blue 2005 Chrysler minivan, license number 5KZP893. The van was registered to JULES VO at 1164 Bendmill Way in San Jose. The woman got out of the van and walked into the residence. She came out several minutes later, followed by two of the theft suspects, who were carrying the same full trash bag that they had carried into the residence earlier. They put the bag into the back of the woman's van and she drove away. I followed her as she drove to 1164 Bendmill Way, parked in front, and dragged the heavy trash bag into the house. I saw that 1164 Bendmill Way had three large white vans parked in front, with California license plate numbers 6X35744, 5X01293, and 3H42959. One of the vans was registered to JULES VO and two were registered to TAN MINH VO (born December 3, 1972, CDL # A1501957).

13.    **Female Fence Identified as MAI NGUYEN.** On January 12, 2006, SJPD Lieutenant Keith Miller saw the light blue Chrysler minivan from the day before (5KZP893) parked next to JV

TOOLS AND GENERAL/WHOLESALE (JV TOOLS), located at 1249 Old Oakland Road in San Jose. He watched a woman come out of the store and drive away in the minivan. Lt. Miller arranged for a stop of the vehicle by SJPD Sergeant Scanlan, who identified the driver as NHU MAI NGUYEN, born May 15, 1953, with CDL # B5463696. MAI NGUYEN told the officer that she worked for "Mr. Jules" at the "flea market," and that her cell phone number was 408-828-2258. I obtained a DMV photo of MAI NGUYEN and identified her as the same person I had seen pick up the trash bag full of suspected stolen merchandise the night before.

14.    **Undercover Flea Market Purchases**. On January 15, 2006, SJPD Detective Paz visited the San Jose Flea Market in order to find out what items JULES VO was selling. Detective Paz found an Asian male selling health and beauty items from the back of a white van (3H42959), i.e., one of the three vans I had seen parked in front of 1164 Bendmill Way on January 11. Detective Paz bought Pepcid and Gillette Sensor 3 razors from the man for $12 total. The detective was also able surreptitiously to take a photograph of the seller, whom I later identified as RICHARD KHOI TRAN, born September 2, 1982, CDL # D2399257.

15.    **MAI NGUYEN Picks Up Merchandise from Booster, Delivers It to JV Tools.** On March 31, 2006, I conducted a surveillance of MAI NGUYEN. I followed her that morning from her residence (1164 Bendmill Way) to 611 Serenade Way in San Jose. She left her house carrying a medium sized trash bag containing unknown items. MAI NGUYEN arrived at 611 Serenade and met with an as-yet unidentified Hispanic female. She entered the residence (carrying the same trash bag she brought with her from Bendmill) and quickly exited (carrying the same bag). She was followed by the Hispanic female, who was carrying a large (seemingly heavy) trash bag full of unknown items. The Hispanic female placed the bag in MAI NGUYEN's minivan (5KZP893) and MAI NGUYEN drove away. I followed her to the Bay 101 card room.

16.    MAI NGUYEN parked in the parking lot of BAY 101 and proceeded inside. While she was inside I approached her vehicle and looked in the windows. I observed large trash bags piled in the center of the van. Several had items spilling out of them. I saw that the bags contained Prilosec, Claritin, and Oil of Olay (among other items).

17.    MAI NGUYEN exited Bay 101 and drove to JV Tools (1249 Old Bayshore Hwy.), where she parked in the parking lot and walked inside. Shortly after she arrived JULES VO arrived and parked next to the minivan. He also walked inside the business. Shortly after JULES VO walked inside MAI NGUYEN exited and drove her minivan around to the front of the store. She opened the rear driver's-side door; JULES VO and TAN VO came out and carried the bags into the store.

18.    On March 26, 2006, I conducted surveillance at 611 Serenade Way and followed the Hispanic female whom I had previously seen give a bag of merchandise to MAI NGUYEN. Among the places I saw her go was to the San Jose Police Department so that she could resolve an outstanding arrest warrant. The officer who dealt with her identified her as Belkin Almendarez. She

provided the following phone number to Officer Kischmischian: 408-394-7543.[1]

19.    **MAI NGUYEN Buys "Stolen" Products from Undercover Officer.** On March 14, 2006, I provided undercover SJPD Officer Mendoza (U/C Mendoza) with MAI NGUYEN's phone number (**408-828-2258**) and asked him to call and offer to sell her some "stolen" products. U/C Mendoza made the call and introduced himself as a friend of another booster who had a bag of merchandise to sell. After a brief conversation, during which MAI NGUYEN asked how much he had to sell, she agreed to meet U/C Mendoza the next evening.

20.    On March 15, 2006, U/C Mendoza phoned MAI NGUYEN again and arranged to meet her in a parking lot at the corner of White and Story Roads in San Jose. U/C Mendoza arrived with a garbage bag full of approximately $7,000 (retail) worth of allegedly stolen OTC/HB merchandise (Claritin, Prilosec, razor blades, etc.). Prior to the meeting, I had covertly marked each item in the hope that we might recover the property again at a later time. U/C Mendoza gave the bag to MAI NGUYEN, who tallied the contents and paid him $700 in cash. MAI NGUYEN complained that some of the items had store stamps and stickers on them, but U/C Mendoza explained that he did not have time to check each item because he steals them so quickly. MAI NGUYEN made notes on a piece of paper of the items she was buying and the amounts she was paying for each. U/C Mendoza kept the note and turned it over to me as evidence.

21.    On March 22, 2006, U/C Mendoza phoned MAI NGUYEN again (at the same number) and offered to sell her another bag of merchandise. They agreed to meet at approximately 2000 hours at a location that was represented to be U/C Mendoza's residence. U/C Mendoza met MAI NGUYEN and gave her a garbage bag containing approximately $3,000 (retail) worth of OTC/HB products. Prior to the meeting, I had again covertly marked each item. Again MAI NGUYEN again complained that some of the items had store markings on them, but she bought them anyway. U/C Mendoza once again responded that he did not have time to look for the markings because he steals the items quickly and without examining them closely. MAI NGUYEN paid U/C Mendoza $800 and again hand-wrote notes about the products she was buying and amounts she was paying. U/C Mendoza kept that list and turned it over to me.

22.    On April 13, 2006, U/C Mendoza telephoned MAI NGUYEN (at the same number) and told her that he had more merchandise to sell. MAI NGUYEN agreed to meet him in the parking lot at the intersection of White and Story Roads. They met that evening and U/C Mendoza handed MAI NGUYEN a garbage bag containing approximately $3,800 (retail) worth of allegedly stolen merchandise (covertly marked by me prior to the operation). Again MAI NGUYEN complained

---

[1]On 07/29/06, Almendarez was arrested in Union City California under the name "Maria Martinez." She was arrested in the process of committing a large-scale theft of health and beauty items from a Safeway store. Almendarez/Martinez admitted to stealing the items for the purposes of re-selling them to a fence in San Jose. A criminal history check reveals that Maria Martinez has used multiple AKAs when she has been arrested and that she has numerous prior convictions for felony theft and burglary in Santa Clara County.

about several of the items, but she bought them anyway. This time U/C Mendoza blamed the mistakes on a cousin who was just learning how to steal. MAI NGUYEN paid $770 for the bag and again wrote out a list of the items she was buying and gave it to U/C Mendoza. At the conclusion of the deal, agents followed MAI NGUYEN as she drove to a restaurant and met JULES VO.

23.    U/C Mendoza completed his final undercover operation with MAI NGUYEN on May 4, 2006. He telephoned her and arranged to meet her in the parking lot at White and Story Roads. They met as before, and MAI NGUYEN paid U/C Mendoza $905 for a garbage bag containing $3,200 (retail) of not just OTC/HB products, but also some tools and phones. At the end of this meeting, MAI NGUYEN gave U/C Mendoza a list of items that she would like to purchase in the future and the prices that she would pay for them. Mendoza turned it over to me as evidence.

### JV Tools (1249 Old Bayshore Highway) Serves as "Hub" for Stolen Merchandise

24.    On May 28, 2008, SJPD Officer Lundquest contacted the Santa Clara County Fictitious Business License Office and obtained a certified copy of JULES VO's filing for a fictitious business name of JV Tools and General/Wholesale. The business license for this location is in the names of "VO, TESS/JULES." Based on my own observations from several visits to the store, JV Tools is generally described as a hardware store, about the size of an Ace Hardware store. It carries an extensive inventory of hardware, mostly construction tools. There is also a small section in the entry and behind the counter where OTC/HB items are displayed for sale.

25.    As stated previously (¶¶ 17-19, *supra*), on March 31, 2006, surveillance I conducted on MAI NGUYEN led directly to JV Tools, located at 1249 Old Bayshore Highway, in San Jose.

26.    On April 14, 2006, *i.e.*, one day after the third transaction between MAI NGUYEN and Undercover Officer Mendoza, I watched her leave 1164 Bendmill Way at approximately 0730 hours and drive to the Bay 101 card room. While she was inside I looked in the windows of her van and saw two plastic bags lying on the floorboards. I recognized them as the same bags Officer Mendoza had sold to MAI the night before. (Prior to the undercover transaction, I had marked both bags with green duct tape for easy identification.)

27.    MAI NGUYEN left Bay 101 at approximately 0845 hours and drove directly to JV Tools. She parked, walked inside, and joined JULES VO, TAN VO, and KEVIN VO (each of whom I recognized from prior contacts and DMV photos). All three subjects appeared to be working the store. JULES VO and TAN VO walked outside moments later and carried the garbage bags (marked with green duct tape) inside the store. JULES VO left at approximately 0915 hours and returned at 0935 driving a white full-size van (5X01293). He parked in front of the store and four employees ran out to unload it. They unloaded five white cardboard boxes and placed them inside the store on the floor. TAN VO, KEVIN VO, and MAI NGUYEN unloaded the contents of the boxes onto the floor and began sorting them.

28.    Posing as a customer, SJPD Officer Gerbrandt entered the store and observed the sorting. He saw that the three were sorting the same types of OTC/HB merchandise that are being boosted

and then purchased at a discount by MAI NGUYEN. Shortly thereafter, I walked into the store wearing a hidden body camera and photographed MAI NGUYEN and KEVIN VO sorting OTC medications, razor blades, and beauty products on the floor. They were sorting like items into boxes. I bought a pair of gloves and then asked to buy one of the boxes of Claritin I saw being sorted on the floor. TAN VO agreed to sell it to me and MAI NGUYEN handed it to me. I paid $8.00 for the Claritin, which would have cost at least $22.00 in a legitimate store.

29.    On June 13, 2006, I again visited JV Tools and saw that the store was continuing to sell the same products that are being stolen by the professional shoplifting crews. This time I also observed that the store was selling DVDs. I remembered that during the fourth undercover transaction, Officer Mendoza had sold MAI NGUYEN several DVDs, including the title "Miracle." I found the same DVD on the shelf (with the covert mark) and purchased it from MAI NGUYEN for $10.

30.    On January 12, 2007, I conducted another surveillance at JV Tools and, during this operation, discovered another location JULES VO and MAI NGUYEN were using to store stolen property: 650 Giguere Court, in San Jose.[2] During this operation I observed MAI NGUYEN drive to JV Tools in her Chrysler minivan (5KZP893) and, with the help of TAN VO, unload approximately 42 boxes from the van and stack the boxes on a pallet in front of the store. The boxes were consistent with those we had previously observed JV Tools ship to illegitimate wholesalers on numerous occasions (see next section). After the van was unloaded, MAI NGUYEN drove to a warehouse located at 650 Guigere Court in San Jose. There, her van was loaded with another 40-50 boxes identical to the ones I had seen unloaded earlier at JV Tools. The boxes were loaded into MAI NGUYEN's van by NGUYEN TRAN. After MAI NGUYEN's van was fully loaded with boxes, NGUYEN TRAN drove the van back to JV Tools (MAI NGUYEN stayed behind at the warehouse.) There, NGUYEN TRAN and KEVIN VO unloaded the boxes onto another pallet in front of the store. SJPD Sgt. Grigg covertly approached the pallets and saw that each box was labeled, showing the contents as OTC/HB items (Prilosec, Claritin, etc.).

### Probable Cause to Search 2534 Brahms Avenue, San Jose

31.    **MAI NGUYEN Picks Up Suspected Stolen Property from 2534 Brahms and Takes it to JV Tools**. On February 10, 2006, MAI NGUYEN was surveilled as she drove away from JV Tools and drove to 2534 Brahms Avenue, a single family home. She parked in the driveway, where she was met by an unknown Asian male. The surveilling officer also noted that there was a white panel van, registered to JULES VO, parked across the street. The unknown Asian male went into the house and came out with three white garbage bags, each approximately half full. He placed the bags into MAI NGUYEN's van and she drove back to JV Tools. JULES VO came out and took the three bags into the store. An officer, posing as a customer, walked into the store. There he saw JULES VO and another Asian male empty the contents of the bags onto the counter near the cash register. The bags contained unopened DVD movies and brand-name razor blades. The officer

---

[2]More recent surveillance has established that the 650 Giguere Court address is no longer being used by the subjects.

BARG AFFIDAVIT (VO)                -9-

watched as JULES VO and the other male sorted the items into separate cardboard boxes. The officer was able to see that some of the razor blade packages had Safeway stamps on them.

32.     During this investigation I have determined that RICHARD KHOI TRAN, TAN VO, and KEVIN VO reside at 2534 Brahms Avenue in San Jose. In addition, MAI NGUYEN claims to reside there as well[3] (although our surveillance indicates that she still lives at 1164 Bendmill). On May 27, 2008, Officer Gerbrandt visited 2534 Brahms on a pretext (neighbors complaining that a JV Tools van was blocking the sidewalk). He knocked on the door. A young female answered. She said that RICHARD KHOI TRAN was the person responsible for the van, so Officer Gerbrandt asked to speak to him. TRAN came to the door. He advised that the JV Tools van was registered to his "boss," JULES VO, and that he (Richard) used the van to deliver tools to the flea market to sell. Officer Gerbrandt asked who else lived at the residence. TRAN responded that TAN VO lived there. In addition, during a surveillance in April 2008, agents observed KEVIN VO drive to this residence from work and then leave shortly thereafter, having showered and changed.

33.     It should also be noted that RICHARD KHOI TRAN is on felony probation for Cal. Pen. Code 496 (possession of stolen property), with a search and seizure condition (Santa Clara Superior Court docket number CC593280).

### Facts Establishing Shipments in Interstate Commerce (Interstate Nexus)

34.     On February 16, 2006, I conducted surveillance of JV Tools and observed that employees had placed two pallets outside the business near the street. Each pallet was loaded with at least 20 boxes (brown cardboard, medium size) and the entire load was covered with plastic stretch-wrap. Both shipments seemed to be waiting for pickup.

35.     The next day I returned to JV Tools and saw the same two pallets waiting outside of the shop for pickup. Finally, in the afternoon, a small trucking company (RJR Transportation) arrived and loaded one of the pallets into the back of a bobtail truck. I followed the truck to an international shipping company, Bax Global (BAX), in Fremont. The pallet was unloaded from the RJR truck and placed inside the BAX warehouse. I met with a BAX employee who explained that RJR is a small company that picks up local shipments for BAX. BAX then loads shipments into an airplane or truck and transports them anywhere around the world. I asked the BAX employee if he was familiar with JV Tools. He checked a database and told me that he was not. He did, however, find records for "JV Wholesale," and told me that according to BAX records, JV Wholesale ships to "OTC Distributors" in Fort Lauderdale, Florida, and to "Straight Shot," in Davie, Florida.

36.     I obtained a state court search warrant for a pallet of merchandise that was shipped by JV Tools on March 21, 2006. I served this warrant at the BAX facility and discovered that the load contained thirty boxes of OTC merchandise, all new and original. Some of the items I found still had store stamps on them. The shipper, as reflected on the shipping labels, was "JV Wholesale

---

[3]See ¶ 44, *infra*.

(ComoSuperstore)." The shipment was destined "KMD Distributor, ATTN: Todd, 3520 Hargale Road, Oceanside, New York 11572." TAN VO signed the shipping document. Each box in each pallet was labeled with a computer-generated inventory of the items contained within that box. After the search, I re-sealed the package so that it could continue to its destination uninterrupted.

37.    On March 28, 2006, I served another state search warrant for another shipment that was being sent by "JV Wholesale." The shipment was destined "KMD Distributor, ATTN: Todd, 3520 Hargale Road, Oceanside, New York 11572." TAN VO signed the shipping document. This shipment also consisted of OTC items such as Claritin and some of the items were marked with store stamps. I looked for some of the items that we had covertly sold to MAI NGUYEN, but did not find any. Each box in each pallet was labeled with a computer-generated inventory of the items contained within that box. After the search, I re-sealed the package so that it could continue to its destination uninterrupted.

38.    On April 11, 2006, I served another search warrant on a pallet of goods that was being sent, via BAX, by "JV (ComoSuperstore)." The shipment was destined "KMD Distributor, ATTN: Todd, 3520 Hargale Road, Oceanside, New York 11572." TAN VO signed the shipping document. This shipment also consisted of OTC items such as Claritin and some of the items were marked with store stamps. (I again looked for some of the items that we had covertly sold to MAI NGUYEN, but did not find any.) During this search warrant I inventoried 29 of the 30 boxes that were on the pallet. Each box had a shipping label identifying the contents and during the inventory it appeared that the labels were accurate, *i.e.*, if a label stated that a box contained 150 boxes of Claritin, then it in fact would contain 150 boxes of Claritin. I provided the inventory to Safeway Investigator Celia Kettle, who gave me a list of prices for the items in the pallet. Based on the information Ms. Kettle provided, I estimate that the entire pallet of merchandise had a retail value of at least $90,000. All of the items in the shipment were OTC related and many had identifying store marks (stamps and stickers). Each box in each pallet was labeled with a computer-generated inventory of the items contained within that box. After the search, I re-sealed the package so that it could continue to its destination uninterrupted.

39.    On April 26, 2006, I served another search warrant on a shipment that was being sent, via BAX, from "JV Wholesale (ComoSuperstore)" to KMD, at the same address in New York. TAN VO again signed the shipping documents. This search warrant revealed that OTC items were again being shipped, but this time I also recovered 58 items that we had covertly sold to MAI NGUYEN on March 15, 2006. Each box in each pallet was labeled with a computer-generated inventory of the items contained within that box. I recognized the items based on covert markings we had placed on them.

40.    On May 16, 2006, I served a final search warrant on a shipment from "JV Wholesale" to "Straight Shot," an intermediate shipping point in Florida. (We have not determined the final destination of this shipment.) This shipment consisted of 20 boxes of OTC merchandise. The search recovered 30 items that we covertly sold to MAI NGUYEN on May 4, 2006. These items were also recognizable based on covert markings that we previously placed on them. Each box in each pallet was labeled with a computer-generated inventory of the items contained within that box.

BARG AFFIDAVIT (VO)                    -11-

41.    BAX has provided us with copies of shipping labels for all shipments from JV Tools during the period between March 7, 2005 through April 9, 2008. During this three-year period, JV Tools shipped over one hundred and fifty loads to distributors in Florida and New York. As shown above, some of those shipments were from "JV Wholesale" alone, while others were from "JV Wholesale (ComoSuperstore)." KEVIN VO was the signatory for 60 shipments; TAN VO was the signatory for 29 shipments; JULES VO signed for 10 shipments; and RICHARD KHOI TRAN signed for 79 shipments.

## Internet Sales of Stolen Property

42.    On December 5, 2006, Officer Gerbrandt discovered two online stores associated with JV Tools: COMOSUPERSTORE.COM and JVWHOLESALE.COM. Using a covert identity, Officer Gerbrandt browsed the websites and made two online purchases of OTC merchandise. He bought $105 worth of OTC/HB items from COMOSUPERSTORE and $95 worth of similar items from JVWHOLESALE. The JVWHOLESALE order was never delivered (and never paid for), but on January 19, 2007 the COMOSUPERSTORE shipment arrived at a covert FBI location in Texas. The shipment was intact and had a return address label of "COMOSUPERSTORE.COM, Attn: Richard, 1237 Old Bayshore Highway, San Jose, CA." Based on the shipping documents we obtained from BAX, it is reasonable to assume that "ATTN: Richard" refers to RICHARD KHOI TRAN.

## JV Tools (2000 Senter Road) is New "Hub" for Stolen Merchandise

43.    On June 29, 2007, agents located a business at 2000 Senter Road, in San Jose, also called "JV Tools and General." I walked inside, posing as a customer, and looked around. The business had not only tools for sale, but also OTC products such as Oil of Olay. The business, which was located inside a warehouse space, had a large storage area that was not accessible to the public. I asked a store employee whether this business was related to the JV Tools on Old Bayshore Road. The employee told me that both stores were owned by the same people. The store logo and name also appeared to be the same as the store on Old Bayshore. On May 28, 2008, SJPD Officer Lundquest contacted the Santa Clara County Fictitious Business License Office and obtained a certified copy of JULES VO's filing for a fictitious business name of JV Tools and General/Wholesale. The business license for this location is in the names of "VO, TAN."

44.    On March 25, 2008, Officer Gerbrandt and I conducted a surveillance targeting both JV Tools locations: the one on Old Bayshore and the one on Senter Road.[4] At approximately 0730

---

[4]Both Officer Gerbrandt and I were pulled away from this investigation during most of calendar year 2007 to work on an unrelated ORC case. During that investigation, I went undercover, posing as a "booster" of construction materials. Upon returning to this investigation in late January 2008, we conducted surveillances, obtained bank and shipping records, and otherwise performed the investigative steps detailed in this affidavit, in order to ensure that the targets were continuing to engage in the same illegal activities we had seen them committing

hours I watched MAI NGUYEN leave 1164 Bendmill Way in her light blue minivan (5KZP893). This vehicle was registered to JULES VO at the Bendmill address. I followed MAI NGUYEN as she drove to the area of South King and Tully Roads, where she picked up an unknown Asian male. She proceeded to the JV Tools store on Old Bayshore. I noticed that her vehicle had a broken third brake light and I directed SJPD Officer Wolf to conduct a traffic stop. Officer Wolf stopped the vehicle as it pulled into the parking lot of JV Tools at 1249 Old Bayshore Hwy. Officer Wolf cited MAI NGUYEN for the violation and obtained her home address, which she gave as 2534 Brahms Avenue, San Jose. She also provided her cell and home telephone numbers as 408-334-8401 and 408-227-5301, respectively.[5]   NGUYEN told the officer that she owned JV Tools.

45.    On March 26, 2008, Officer Gerbrandt and I conducted surveillance at both JV Tools locations. Officer Gerbrandt observed that MAI NGUYEN was working inside the store on Old Bayshore, while I saw that JULES VO was working at the store on Senter Road.

46.    At one point I followed a subject driving a black Toyota Scion (5RZX354, registered to NGUYEN TRAN at 1164 Bendmill) from the JV Tools on Old Bayshore to the JV Tools location on Senter Road. I identified the driver as NGUYEN TRAN. He arrived at the store and parked around the south side near a set of loading doors. The loading doors were open and there were two employees sorting retail merchandise (Prilosec, Crest Whitestrips, Pepcid AC, and lotions) into different boxes. The two subjects were examining each item carefully, wiping them down with what appeared to be a baby wipe, then placing the items into different boxes. They moved some boxes into the JV Tools warehouse and loaded others into a plain white van (# 6X35744, registered to JULES VO); other boxes were tossed into a dumpster. NGUYEN TRAN appeared to check on the progress of these subjects and then he walked inside the business. I also saw JULES VO and TAN VO walk outside through the open bay door and observe the work.

47.    On March 27, 2008, Officer Gerbrandt and I followed MAI NGUYEN to 1467 Mt. Lassen Drive in San Jose. She parked her van in the driveway and started to walk to the front door. Before she had made it very far the door opened and a heavyset Hispanic male walked out and placed a medium-sized cardboard box inside the van. MAI NGUYEN appeared to hand him something from her purse in return. MAI NGUYEN then drove straight back to 1164 Bendmill Way.

### Facts Establishing Money Laundering By Certain Defendants

48.    I submit that there is probable cause to believe that JULES VO and NGUYEN NHU TRAN are guilty of money laundering and/or of structuring financial transactions. The facts supporting this

---

throughout 2006.

[5]Verizon records show that the address associated to cellular telephone number 408-334-8401 is 2534 Brahms Avenue in San Jose. The home number MAI NGUYEN provided, however, is the same as the home number for JULES VO, whom surveillance has confirmed lives at 1164 Bendmill Way, San Jose.

BARG AFFIDAVIT (VO)                    -13-

conclusion as to each of these defendants are set forth in the following paragraphs. (The facts set forth in the following paragraphs are based on information told to me by IRS CI Special Agent Quyen Madrigal.)

49.    **Overview of Account Activity for VO's Organization.**    During the course of this investigation, the following five bank accounts were identified as being used by JULES VO or his associates.

| Bank Name | Bank Account # | Name on Account |
|---|---|---|
| Technology Credit Union | # 209636 | Tess Vo and Jules Vo |
| Technology Credit Union | # 900874 | J.V. Wholesale & Retail |
| Citibank | # 040035995568 | Jules M. Vo |
| Bank of America | # 23551-43074 | Nguyen NhuTran dba Comosuperstore |
| Wells Fargo Bank | # 888-7018300 | Nguyen Nhu Tran dba Comosuperstore |

The records from these accounts show that in excess of $5,682,626 million has been deposited into these various accounts from wholesalers specializing in over-the-counter and health-and beauty-products. Those deposits were then used for the purchase of stolen retail products that were shipped through Bax Shipping. The payments were received via wire transfer, counter deposits and by checks. Most of the payments received from customers were in even dollar amounts – which is unusual for payments of legitimate invoices.

50.    Moreover, from 2004 to the present, there have been over 130 Currency Transaction Reports (CTRs) filed on VO and/or his business. In addition, information obtained from Bank of America reveals frequent cash withdrawals from the Comosuperstore account, which is unusual for a web-based business.

51.    From January 2005 through July 2006, JULES VO wrote personal checks to TAN VO for $41,900, to KEVIN VO for $161,900, to MAI NGUYEN $22,000, and to RICHARD KHOI TRAN for $129,041. In addition, JULES VO's bank accounts also showed payments to Thuy Dang, Truc Le, Doug Dang, Dinah Dang, and Leo Nguyen, totaling approximately $130,773.[6]

52.    **Technology Credit Union # 209636**, held in the name of Tess Vo and JULES VO. This account has received approximately $434,000 worth of wires from wholesale OTC/HB distributors. This account was also used to pay JV Tools employees (such as Tan Vo $30,000 and Kevin Vo $5,000) who assisted with the illegal activities described in this affidavit, to pay for mortgage

---

[6]These persons are the subjects of a separate search warrant being presented to the Court at the same time as this one.

BARG AFFIDAVIT (VO)                    -14-

expenses belonging to and related to JULES VO (approximately $14,000), and for lease payments for 1249 Bayshore Highway (one of the two JV Tools locations). In addition, JULES VO received $13,000 in check payments from this account and conducted at least, $54,000 worth of wire transactions from this account to Martha Estrada, a known booster.[7]

53.    **Technology Credit Union #900874**, held in the name of J.V. Wholesale & Retail. This account was opened June 8, 2007 and shows deposits totaling over $2,071,590 from June 2007 through March 2008. The deposits are mainly wire transfers from vendors such as Prime International Products, ZRN Enterprises, Best Buy Trading, and KMD Distributors. In particular, records for this account show eight (8) wire transfers deposited into this account from KMD Distributors, 3520 Hargale Court, Oceanside, New York, totaling $328,383, during January through March 2008. The most recent wire transfer deposit was received on May 14, 2008, for $34,752.40. Phone records indicate that JULES VO is in frequent contact with this and other vendors, and shipping records show that he is shipping them products. This account also reflects frequent cash withdrawals in amounts that appear to be designed to avoid CTR filing requirements. For example, in January 2008 there were a total of $117,000 in cash withdrawals, almost all of which were in amounts less than $10,000, with multiple withdrawals in one day, or on consecutive days.

54.    **Citibank # 040035995568**, held in the name of Jules M. Vo. JULES VO has an equity line of credit as well as a checking account with Citibank. A sample review of this account has shown that from February 2007 through April 2007, JULES VO used this account to conduct over $163,405 in wire transactions. Of that amount, approximately $60,000 was used to pay Martha Estrada. In addition, JULES VO used this account to pay personal and business expenses.

55.    **Bank of America account # 23551-43074**, in the name of NGUYEN NHU TRAN, dba Comosuperstore. An analysis of this account reveals that, from February 2006 through March 2007, NGUYEN TRAN used this account to receive over $889,750 from KMD Distributors, in New York. From this account NGUYEN TRAN wrote over $216,000 in checks to JULES VO. TRAN also made payments totaling approximately $410,401 to a Bank of America Line of Credit under the name JULES VO. Also, $39,000 worth of checks was paid on a Citimortgage account under the name JULES VO for his residence located at 1164 Bendmill Way, in San Jose. A current review shows that this account received five wires from KMD Distributors, totaling $186,983.35, from April 6, 2007 through April 22, 2008. In addition, on April 18, 2008, NGUYEN TRAN withdrew

---

[7]The information regarding Martha Estrada is based on a Los Angeles County Investigator's report of a search warrant executed at Estrada's home on 4/20/2007. Estrada eventually pled guilty to 496 P.C. (receiving stolen property), 182 (conspiracy), and 186.10 (money laundering), and is currently serving a two-year prison sentence. Estrada admitted to agents that she had been involved in an organized retail theft ring since approximately 2001. Her Bank of America account statement dated March 9, 2007, showed three wire deposits from Jules Vo's bank accounts in just that one month: one wire from Technology Credit Union account 20963611 ($9,000), and two wires from Citibank account 040035995568 (total: $40,277).

$27,000 which was used to purchase 3 cashier's checks in the amount of $9,000, each payable to JV Wholesale.

56.    **Wells Fargo Bank account # 888-7018300,** held in the name of NGUYEN NHU TRAN dba Comosuperstore. A current review of this account shows receipt of payments for the sale of stolen property. In addition, the account does not show legitimate payments to vendors and also shows large and frequent currency withdrawals under the CTR reporting limit to avoid filing requirements.

## Information Regarding Items to Be Seized

57.    I submit that there is probable cause to believe that evidence of the criminal offenses described in this affidavit will be found at each of the locations described in paragraph one of this affidavit. Those locations are more particularly described in Attachments A-1 through A-4. In the following paragraphs I will summarize the reasons why I believe that the evidence, fruits, and instrumentalities of crime, more particularly described in Attachment B, will be found at each of those locations.

58.    Based on my training and experience and through discussions with experts, I know that individuals engaged in fraudulent schemes using apparently legitimate business entities generally maintain some sort of business records (whether in paper or electronic form or both). Furthermore, I am aware that there are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may appear to be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and pager bills, keys to safe deposit boxes and rental storage lockers and computer hardware and software), but may be both relevant and significant when considered in light of other evidence. Likewise, the evidence may be highly valuable to the offender or have high utility for legal applications, such as valuable personal property (e.g., art, jewelry, precious metals and stones, real estate, securities), large sums of U.S. currency, safes, firearms, communications equipment, and computer equipment. The criminal offender may no longer realize that he or she still possesses the evidence or that law enforcement could obtain a search warrant to seize the evidence. Criminals who maintain large amounts of cash at their home or business will often keep that money in a safe in the home or business or, alternatively, in a bank safe deposit box or off-site in a storage locker. I have personally observed that the locations described in Attachments A-2, A-3, and A-4 each have surveillance cameras mounted outside the premises.

59.    With respect to money laundering offenses, I have learned through my experience and through discussions with recognized law enforcement experts, including discussions with informants and former co-conspirators that:

    a.    Persons who commit illegal money laundering frequently operate several businesses at one time, frequently change the name of, or incorporate new businesses, in order to evade

**BARG AFFIDAVIT (VO)**                    -16-

discovery. Such persons may also maintain numerous business bank accounts and create multiple layers of movement of their funds in an attempt to mask the disposition of the illegal proceeds;

b.      Persons who commit money laundering activities frequently maintain records of such transactions similar to the recordkeeping of legitimate businesses. Such records are commonly retained for long periods of time, often years after the actual laundering activities occurred. Those records often show evidence to identify co-conspirators; the location of bank accounts used to launder the illegal proceeds, including nominee names to maintain these accounts; and the identification of property, both real and personal, belonging to the money launderer or his co-conspirators that were purchased with illegally laundered funds;

c.      Persons involved in the laundering of illegal proceeds often receive significant financial profits as a result of their laundering activities. Evidence tending to establish the receipt of significant, unexplained, and unreported income may include state and federal tax returns; bank statements, including deposit slips and canceled checks; savings passbooks; records of the purchase of cashier's checks and official bank checks; business and personal ledgers; and personal computer records. Such evidence will also assist the government in identifying property, both real and personal, that constitutes ill-gotten gains that may be subject to seizure. Money launderers often seek to conceal the illegal profits by diverting laundered funds into the purchase of real estate, investments in brokerage accounts, vehicles, investments in legitimate businesses, precious metals, jewelry, or other tangible assets;

d.      Persons who launder illegal proceeds frequently keep large quantities of currency on hand. This is because it is an item essential to carrying on the activity of money laundering. In this case, it is all the more true because that currency is needed to keep the business going (by paying boosters for new product). This currency is usually found in the individual's residence, businesses, vehicles, and in safe deposit boxes at financial institutions linked to these persons.

60.    For these reasons, as well as additional reasons stated previously, I believe that it is probable that evidence, fruits, and instrumentalities, such as those items more particularly described in Attachment B, will be found at the locations proposed to be searched.

### Information Regarding Data Stored Electronically

61.    Based upon my knowledge, training, and experience, including information provided to me by others with specific expertise in this area, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

BARG AFFIDAVIT (VO)                              -17-

a..    Computer storage devices (like hard disks, diskettes and CD-ROMs) can store the equivalent of thousands of pages of information. Additionally, a user may try to conceal criminal evidence by storing it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site.

b.    E-mail is known to be a popular method of communication between associates or conspirators who reside in different locations. Evidence of e-mail communications may be found in Internet history, e-mail applications, etc., which can be found on computers.

c.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.

d.    Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. Based on my training and experience I know that computer users sometimes encrypt files, and that such users may keep the encryption passwords or encryption keys separately written in their residences or on a separate computer file.

62.    Because of the volume of the data at issue and the technical requirements set forth above, it may be necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting.

63.    Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel, I know that searches and seizures of evidence from computers taken from the subject possession commonly require agents to seize most or all of a computer system's input/output peripheral devices for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the subject possession, and in order to fully retrieve data from a computer system, investigators must seize all magnetic storage devices as well as the central processing units ("CPU") and applicable keyboards and monitors which are an integral part of the processing unit.

64.    The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately

BARG AFFIDAVIT (VO)                            -18-

retrieve the evidence listed above. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation. Without these items, it may be difficult to recreate the computer environment in which the seized data was created. This is important both for thorough analysis and for establishing the ultimate integrity of the seized data.

65. **Analysis of Electronic Data**. The analysis of electronically stored data, whether performed on site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but are not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

66. **Computer Search Protocol**. I am aware of the "Protocol for Searching Devices or Media that Store Data Electronically" that has been adopted by the Court in the Northern District of California. I attest that the search and seizure of any electronic media shall be handled in accordance with the protocol set forth in Attachment C, incorporated here by reference.

## Request Approval for Assistance from Private Parties

67. I expect that the amount of stolen merchandise that would be recovered upon the execution of the requested search warrants will be substantial. For example, in a similar search warrant executed in Oakland in February of 2007 (Docket No. 4-07-70093 WDB), I am told that 235 pallets were recovered. The volume filled twelve full-size tractor trailers. The process of inventorying this volume of material would be extremely time-consuming for the agents, who would have to count and catalogue each item seized piece by piece. Investigators from a number of retail victims have offered to assist with the inventory process. They have offered to provide personnel, familiar with the inventory and labeling methods of each store, to assist both in (1) cataloging and valuing the items seized, and (2) identifying any items that belong to their chains.

68. Such assistance would of course be extremely useful to the agents executing the search warrant. In addition, it would enable the victim companies to recover those items that could be identified as having been stolen from them. I therefore request that this Court authorize private store personnel to assist law enforcement in preparing the inventory of items seized pursuant to these search warrants. No private party would be involved in the initial entry into the search locations. Rather, those personnel would be kept at a safe distance until each search location had been secured by law enforcement officers. Only after a particular search location had been secured, and property identified that it would be beneficial to have the assistance of store personnel in inventorying, would

BARG AFFIDAVIT (VO)                    -19-

such private parties be summoned to the scene. Any and all private persons assisting at the scene would do so only under the direct supervision of a law enforcement officer.

## Conclusion

69.     Based on my observations I respectfully submit that there is probable cause to believe that the subjects described in Paragraph 1 of this affidavit are committing the offenses ascribed to each of them in that paragraph, and therefore respectfully request that warrants issue for their arrest. I further submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the commission of the foregoing offenses will be found at the locations described in Attachments A-1 through A-4. I therefore respectfully request a search warrant for those premises, authorizing agents to search for and seize the evidence, fruits, and instrumentalities described in Attachment B.

70.     As this investigation is continuing, disclosure of the arrest warrants, search warrants, seizure warrants, this affidavit, or this application and the attachments thereto could jeopardize the progress of the investigation. Such disclosure would give the subjects an opportunity to cease their criminal activities, destroy evidence, notify confederates, and otherwise interfere with the investigation. Accordingly, I request that the Court issue an order that the arrest and search warrants, this affidavit in support of application for search warrant, the application for search warrant, and all attachments thereto be filed under seal until further order of this Court.

## Request for Sealing

71.     As this investigation is continuing, disclosure of the search warrant, this affidavit, or this application and the attachments thereto could jeopardize the progress of the investigation. Such disclosure would give the subjects an opportunity to cease their criminal activities, destroy evidence, notify confederates, and otherwise interfere with the investigation. Accordingly, I request that the Court issue an order that the arrest and search warrants, this affidavit in support of application for the same, the application for the arrest and search warrants, and all attachments thereto be filed under seal until further order of this Court.

JOHN L. BARG
Task Force Agent, FBI

Subscribed and sworn to before me

this 2 day of June 2008

PATRICIA V. TRUMBULL
United States Magistrate Judge

BARG AFFIDAVIT (VO)                    -20-